```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
RICHARD BLIE,
                Petitioner,                    MEMORANDUM & ORDER
                                               04-CV-4022 (JS)

        -against-

DALE ARTUS, Superintendent
Clinton Correction Facility,

                Respondent.
----------------------------------X
APPEARANCES:
For Petitioner:     Richard Blie, pro se
                    99-A-3633
                    Clinton Correctional Facility
                    P.O. Box 2001
                    Dannemora, NY 12929

For Respondent:     Michael Herman Blakey, Esq.
                    Suffolk Country Assistant District Attorney
                    Criminal Court Building
                    200 Center Drive
                    Riverhead, NY 11901
```

<u>INTRODUCTION</u>

Petitioner Richard Blie ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner alleges that his constitutional right to a fair trial was violated because "the trial court erroneously instructed the jury that Petitioner's [confession] may not be received into evidence unless such statement was voluntarily made." (Petition p. 6.) Petitioner argues that this instruction created an inference that the question of voluntariness had already been decided. For the reasons below, Petitioner's writ of habeas corpus is DENIED.

<u>PROCEDURAL HISTORY</u>

Petitioner seeks to vacate his Suffolk County, New York

conviction of two counts of Murder in the Second Degree, and one count of Attempted Murder in the First Degree. A judgment of conviction was entered on March 17, 1999. Petitioner was sentenced to three indeterminate sentences of twenty-five years to life; the first two counts to run consecutively with the third for an aggregate total of fifty years.

On February 18, 2003, the New York Appellate Division, Second Department affirmed the trial court's judgment of conviction. See People v. Blie, 755 N.Y.S.2d 265 (N.Y. App. Div. 2d Dep't 2003). On July 16, 2003 the New York Court of Appeals denied petitioners application for leave to appeal. See People v. Blie, 100 N.Y.2d 579 (2003). This petition timely followed on September 15, 2004.

Thereafter, on December 13, 2005, Petitioner asked the Court to stay his petition while Petitioner returned to state court to exhaust his claims. The Court granted Petitioner's request on that same day. On October 31, 2007, the Court received a letter from Petitioner requesting that the Court reinstate his Petition; accordingly, the case was re-opened, and the petition for a writ of habeas corpus is again pending before the Court.

## FACTUAL BACKGROUND

On September 27, 1997, Petitioner and two accomplices robbed an armored van and shot two guards, killing one. On January 16, 1998, Petitioner was arrested, advised of his constitutional

rights, and taken to the homicide squad for questioning.

At the time of the crime, Petitioner was a former employee of Patriot Armored Car Service ("Patriot"). Patriot was responsible for various money pick-ups, transfers, and drop-offs, which were done in armor-plated vans. On Friday nights, employees made numerous pick-ups and drop-offs on Route 26, in Suffolk County, Long Island ("Route 26"). The second to last stop on Route 26 was Tanger Outlet, and the last stop was the Suffolk County National Bank ("SCNB") in Riverhead, Long Island.

During his tenure with Patriot, Petitioner worked the Route 26 drive on at least one occasion with Joseph Micieli, Jr. ("Micieli Jr."), the son of one of the Patriot employees wounded during the robbery.[1] On the night of the robbery, Micieli Jr. was working as a dispatcher, while Joseph Micieli, Sr. ("Micieli Sr."), was working as an armed courier on Route 26 with Andre Herring ("Herring"). At approximately 11:40 p.m., Herring telephoned Micieli Jr. and informed him that he was having difficulty rearming the alarm at Tanger Outlet. Approximately ten minutes later, Micieli Jr. heard his father say on the radio that he had been shot. Micieli Jr. called 911 from the dispatch office, and drove to Central Suffolk Hospital, where his father was being treated in

---

[1] John Halverson, Vice President of Patriot Courier Services testified that Petitioner had worked Route 26 and made the SCNB stop approximately thirty times. (T. 734-738).

3

the emergency room.

In the emergency room, Micieli Sr. told his son that three men wearing masks emerged from the bushes at the SCNB.[2] Micieli Sr. testified during the trial that three men came at him in a row, the shortest being on the left and the tallest man being on the right. He further testified that all three men were of African-American descent, and that the tallest perpetrator tried to kill him.[3] Micieli, Sr. was shot a total of six times, with two shots fired at point-blank range. Herring was shot and killed. After the shooting subsided, Micieli Sr. heard the men moving the milk crates inside the armored truck that the Patriot employees used to carry money. When he thought the men had left, Micieli Sr. called the dispatcher to report the incident.

On October 17, 1997, "Crime Stoppers" received an anonymous tip from a female who indicated that she knew someone involved in the robbery. The caller stated that she knew a woman named Barbara Brown ("Brown") and her daughter Shavetta, and that Shavetta was married to a man named Richard, who was a former security guard. According to the caller, Shavetta and her husband, a man named Richard, had recently spent a large amount of money on

---

[2] Micieli Sr.'s statements to his son were admitted during the trial as excited utterances.

[3] Petitioner testified later that he was six feet tall, and that his two accomplices were shorter than him, thus creating the inference that Petitioner was the perpetrator trying to kill Micieli Sr. (T. 1969-1976).

4

cars, which led the caller to believe that Richard was involved in the robbery. On October 20, 1997, the same anonymous person called again, and this time disclosed Petitioner's full name, address, and the license plate to Petitioner's wife's new car.

The police department traced the anonymous caller to a woman named Rene Talley ("Talley"). A subsequent interview with Talley revealed that Brown, Petitioner's mother-in-law, told some of her neighbors that Petitioner was involved in a robbery and that Brown was angry because Petitioner spent approximately $40,000.00 on new cars for himself and his wife, and only spent $3,000.00 on Brown. An investigation of the robbery and murder resulted in evidence that Petitioner had made several large cash purchases following the crime.[4]

Petitioner was arrested on January 16, 1998, taken to Suffolk County police headquarters, placed in an interview room, and questioned by Detectives Douglas Mercer and Anthony Laghezza. During this interview, Petitioner confessed to being present at the scene of the robbery, implicated his two accomplices, and described the details of the crime.

The facts surrounding Petitioner's confession were

---

[4] Prior to Petitioner's arrest, the police had obtained evidence that Petitioner made large cash purchases which included a cell phone ($150.00), a bracelet for his girlfriend ($2,000.00), a computer for a different girlfriend ($2,000.00), and a Glock 19 gun ($500.00). (Huntley Hearing 1, pg. 26). Furthermore, the police had gathered evidence that Petitioner had also purchased two new automobiles. (Id. at 19-23).

5

presented at a Huntley hearing ("HH") on September 2 and 3, 1998 in the New York Supreme Court, Suffolk County. At the hearing, Detective Mercer testified that he informed Petitioner of his constitutional rights prior to questioning, and that Petitioner answered "no" after being asked whether he wanted to contact a lawyer. Additionally, Detective Mercer testified that Petitioner was not threatened or coerced at all, remained calm during his questioning, and did not request an attorney at any point. Furthermore, prior to the questioning, Petitioner signed a constitutional rights card, acknowledging that he understood his rights and waiving his right to counsel.

After advising Petitioner of his Miranda warnings, Detective Mercer questioned Petitioner about his employment with Patriot, his time in the Navy, and his recent cash purchases. When questioned about his new automobile purchase, Petitioner claimed that a friend from California sent him $30,000.00, which Petitioner used to purchase the car. However, the Detectives informed Petitioner that they knew Petitioner had spent approximately $40,000.00 in cash since the robbery. Petitioner eventually admitted that he was involved in the robbery, but denied committing the murder.

When questioned further about the details of the robbery, Petitioner admitted that he committed the crime with two accomplices, Jeffus Leftenant ("Leftenant") and Jamal Starks

6

("Starks"). (Id. at 23). Petitioner claimed that the robbery was Leftenant's idea and that all of the participants had cased the bank prior to the robbery. (Id. at 25). Additionally, Petitioner denied carrying a weapon during the commission of the crime, claiming that only Leftenant and Starks had guns. (Id. at 27). Furthermore, Petitioner described the clothing, masks, and gloves that he and his accomplices wore during the crime. (Id. at 26-27).

During the interview, the Detectives gave Petitioner water on several occasions and permitted Petitioner to use the bathroom. Petitioner was offered food on more than one occasion, but refused. However, at approximately 6:30 a.m. on October 17, Petitioner was offered, and accepted, a ham and egg sandwich, potatoes, and juice. Following the questioning, Petitioner agreed to provide the detectives with a written statement detailing the robbery. Prior to signing the statement, Petitioner read it aloud and made several minor corrections. Furthermore, Petitioner identified crime scene photographs, identified photographs of his accomplices, and allowed the police to search his home and car. Lastly, over the course of the interview, Petitioner was advised of his constitutional rights and was never threatened, coerced, or promised anything in exchange for his cooperation.

At the conclusion of the HH, Judge Richard Klein denied Petitioner's motion to suppress his statements in its entirety. Petitioner's statements were therefore introduced during his trial.

At the trial, Petitioner testified that he did not participate in the robbery, and that on the night of the crime, he was alone at his uncle's residence. (T. 1854-1855.) Petitioner stated that the large cash purchases he made following the crime were made with money he had saved while in the Navy. Additionally, Petitioner testified that he was threatened and physically beaten by detectives during the interrogation, and that he had asked for a lawyer but was told that he would not get one. (T. 1862-1875.) Furthermore, Petitioner claimed that he had signed a written confession but that he did not personally compose or read it because of the threats that the detectives made during the interrogation. (T. 1875-1889.)

Following closing arguments, Judge Klein charged the jury that "evidence of any statement made by a defendant with respect to his participation or lack of participation in the crimes with which he is charged may not be received in evidence against him at trial unless such statement was voluntarily made." (T. 2198.) Additionally, the Judge's instruction provided,

> Before you consider the defendant's statements to [Detective] Mercer as evidence against the defendant, you must find that the defendant was advised of his constitutional rights, and that the defendant knowingly, intelligently, and voluntarily waived them and agreed to answer questions or make a statement.
>
> The People have the burden of proving beyond a reasonable doubt that the defendant voluntarily made his statement after being advised of and waiving these rights. If you

> find that the People have failed to sustain this burden, you must completely disregard the defendant's statements. If you find that the People have sustained this burden, and that the defendant Richard Blie made the statements knowingly, intelligently, and voluntarily, you may then consider what weight, if any, you will give them.

(T. at 2200, 2201).

Petitioner now argues that the charge to the jury was erroneous. Petitioner claims that since his statements were already offered as evidence during the trial, the question of voluntariness had already been decided.

## STANDARD OF REVIEW

A federal court may entertain a petition for habeas corpus on behalf of an individual in state custody "pursuant to the judgment of a State court only on the ground that [petitioner] is in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254 (1996). The petition for habeas corpus will not be granted with respect to any claim adjudicated on the merits in state court, unless one of two instances occur. See id. The petition may be granted if the determination made by the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A federal court may also grant a petition if the decision made by the state court "resulted in a decision that was based on an unreasonable determination of the

9

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The Supreme Court has determined that a judgment rendered by a state court is "'contrary to' . . . clearly established law if it 'applied a rule that contradicts the governing law set forth in [Supreme Court] cases or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from . . . precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 15-19-20, 146 L. Ed. 2d 389 (2000)).

A federal court has the authority to grant a writ of habeas corpus "'if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003)(quoting Williams, 529 U.S. at 413, 120 S. Ct. at 1523)). A habeas petition may be granted if the federal court determines that the state court's application of well-established legal principles announced by the Supreme Court was "'objectively unreasonable.'" Id. (citing Williams, 529 U.S. at 409). In interpreting this standard, the Second Circuit has stated that "'[s]ome increment of incorrectness beyond error is required . . .

10

[but] the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Mask v. McGinnis, 252 F.3d 85, 89 (2d Cir. 2001)(quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)). Lastly, a federal court may grant habeas relief when a "'state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Jenkins v. Artuz, 294 F.3d 284, 292 (2d Cir. 2002) (quoting Williams, 529 U.S. at 407, 120 S. Ct. at 1520)).

DISCUSSION

Petitioner argues that habeas relief is warranted because he was denied his constitutional right to present a defense. Specifically, Petitioner claims that the trial judge erroneously instructed the jury on the legal standard regarding the admissibility of his confession. During the jury charge, the trial judge provided the jury with the following instruction: "[b]efore you consider the defendant's statements to [Detective] Mercer as evidence against the defendant, you must find that the defendant was advised of his constitutional rights, and that the defendant knowingly, intelligently, and voluntarily waived them and agreed to answer questions or make a statement." (T. 2200). Petitioner contends that since his statement was offered into evidence at

11

trial, it created the inference that this question had already been determined against him. The Court notes that Petitioner is not seeking review of the voluntariness of his statement; rather, Petitioner's sole argument is that the trial court's instruction to the jury was erroneous.

Respondent argues that the jury instruction was a correct statement of law, and that the instruction constituted the appropriate legal standard for a jury to determine the voluntariness of a criminal defendant's statements made to officials while in custody. The Court agrees.

I. The Trial Court's Charge Was Not Erroneous

It is well established that a criminal defendant's due process rights have been violated when their conviction hinges on the admission of an involuntary confession. See Dickerson v. United States, 530 U.S. 428, 433, 120 S. Ct. 2326; 147 L. Ed. 2d 405 (2000) (noting that due process jurisprudence requires courts to "exclude confessions that were obtained involuntarily"). When the prosecution intends to introduce a defendant's confession into evidence, the trial judge has an obligation to "determine any issue as to voluntariness" outside of the presence of the jury. 18 U.S.C. § 3501(a). If the trial judge determines that the confession was voluntary and admits it into evidence, the "trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to

the confession as the jury feels it deserves under all the circumstances." Id. The Second Circuit has "clarified that 'an instruction of the kind required by 18 U.S.C. § 3501 is mandated only where an issue of voluntariness has in fact been raised at trial.'" United States v. Elfgeeh, 515 F.3d 100, 126 (2d Cir. 2008) (quoting United States v. Fuentes, 563 F.2d 527, 534 (2d Cir. 1977)).

Here, the trial court properly held a hearing outside the presence of the jury after Petitioner raised the issue of the voluntariness of his statements. After hearing the evidence presented at the hearing, the trial judge determined that Petitioner was at all times advised of his constitutional rights, was never threatened or coerced, and voluntarily made his statements. Accordingly, the court allowed the statements to be offered into evidence, and properly provided the jury with instructions that comported with 18 U.S.C. § 3501. Petitioner does not argue that he was deprived of a fair hearing, nor does he ask the Court to review the voluntariness of his statement in any other manner. Petitioner solely argues that the trial court's instruction was erroneous because the prosecutor already offered Petitioner's statements into evidence, which created an inference that Petitioner's statements were voluntarily made.

"[A] federal habeas court must evaluate a trial court's jury instruction to determine 'whether the ailing instruction by

itself so infected the entire trial that the resulting conviction violates due process.'" Pinero v. Greiner, 519 F. Supp. 2d 360, 369 (S.D.N.Y. 2007) (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)). Moreover, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp, 414 U.S. at 147. Here, after examining the charge in its entirety, the Court finds that the instructions provided by the trial judge comported with 18 U.S.C. § 3501 and properly advised the jury that they must consider all evidence presented on the issue of voluntariness prior to considering Petitioner's statements.

18 U.S.C. § 3501 states that the trial court must permit the jury to hear all relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances. Here, the trial judge clearly provided the instructions required by Section 3501. The trial judge informed the jury that they must first find that Petitioner's statements were voluntarily made. The trial court further advised the jury that the prosecutor had the burden of proving beyond a reasonable doubt that Petitioner voluntarily made his statement after being advised of and waiving his rights. The trial judge's instruction went on to advise the jury that if they find Petitioner's statements to be voluntary, then they must consider "what weight,

14

if any, [the jury] will give to them." (T. 2201.) The Court finds that this instruction is clear and not susceptible to misinterpretation, and is akin to instructing the jury "to give such weight to the confession as the jury feels it deserves under all the circumstances."  18 U.S.C. 3501.

Petitioner's argument that the fact that the statements were offered into evidence created an inference that the issue of voluntariness had already been decided is illogical.  At the outset, it would defy logic to hold that the statements should not have been offered into evidence at all until the jury determined its voluntariness; the statements had to have been offered into evidence in order for the jury to be aware of the statements' existence and to consider its voluntariness and relevance. Furthermore, the trial court properly instructed the jury pursuant to 18 U.S.C. § 3501 that before they could consider Petitioner's confession, they must first determine that it was voluntarily made, and thereafter, they must give the statements such weight as the jury determined the statements deserved.  This limiting instruction is completely in accord with established federal law, and did not constitute an unreasonable application of federal law.

Petitioner has not presented the Court with any basis to conclude that the jury would misinterpret a proper jury charge and disregard the trial judge's instruction to evaluate the voluntariness of Petitioner's statement and give the statement such

weight as the jury believed it deserved.  Accordingly, Petitioner has failed to show that the trial court provided an erroneous charge that "infected the entire trial," Cupp v. Naughten, 414 U.S. 147, and the Court therefore rejects Petitioner's claim that he was denied a fair trial due to the trial judge's jury instructions.

II. Petitioner's Remaining Claims Are Time-Barred

The Court notes that Petitioner's motion to reinstate his petition alludes to additional arguments, such as ineffective assistance of trial and appellate counsel and the prosecution's alleged failure to disclose exculpatory evidence at Petitioner's trial.  These arguments are not part of Petitioner's original petition, and Petitioner has not made any request to amend his petition, nor has he filed an Amended Petition.  Moreover, Petitioner does not directly argue any of these claims in his motion for reinstatement.  However, given Petitioner's pro se status, the Court will construe Petitioner's papers liberally and assume that Petitioner intended to file a motion to amend his petition to add these additional claims.  To the extent that Petitioner wishes to amend his Petition, any such amendment is denied as time-barred.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") places a one-year period of limitation on all applications for a writ of habeas corpus.  See 28 U.S.C. § 2244(d)(1).  "When a petitioner seeks to add claims to a petition

16

after the statute of limitations has expired, the new claims must 'relate back' to the original petition." Johnson v. Ercole, No. 08-CV-1268, 2008 U.S. Dist. LEXIS 72067, at *7 (E.D.N.Y. Sept. 22, 2008). The new claims must arise out of the same "conduct, transaction, or occurrence" as the claims in the original petition. Fed. R. Civ. P. 15(c)(1)(B). "That both claims challenge the same conviction is not enough; an amendment will not relate back if it 'asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'" Id. at *7-8 (quoting Mayle v. Felix, 545 U.S. 644, 650, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005)).

Here, Petitioner's original petition questioned only the trial judge's jury charge regarding the voluntariness of Petitioner's statements. Petitioner's new claims, to the extent that they exist, relate to the effectiveness of Petitioner's counsel and the Prosecutor's duty to turn over exculpatory material. These new claims differ in facts and in time to Petitioner's original claims, and therefore do not relate back to the original petition. See Soto v. Conway, 565 F. Supp. 2d 429, 439 (E.D.N.Y. 2008).

III. A Certificate Of Appealability Is Denied

The Court will not issue a certificate of appealability in this case. Petitioner has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C § 2253. The issues

17

involved in this case are not debatable among reasonable jurors, a court could not resolve the issues in a different manner, and the questions involved do not deserve encouragement to proceed further. See Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000)

## CONCLUSION

For the reasons stated above, the Court DENIES Petitioner's writ of habeas corpus in its entirety. The Court will not issue a certificate of appealability. The Clerk of the Court is directed to mark this matter as CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: Central Islip, New York
December  22 , 2008